12-1117 VALLEANT INTERNATIONAL v. HAVASTI Jeff Toney, on behalf of the law firm Passowitz Benson, Torres & Friedman. I'm here on behalf of activists and Watson, the defendant and appellant in this matter. This, of course, is a patent matter. It arises out of a series of patents that are directed to bupropion hydrobromide. Bupropion itself, however, was actually discovered some 40 years ago and was claimed and disclosed in a patent application filed in 1969 that issued in the early 70s and is referred to in the court below as the MEDA 706 patent. That patent exemplifies, discloses, and claims bupropion as a treatment for depression and actually has two claims directed to bupropion hydrobromide. It's claim number three, which discloses the mineral acid salts of bupropion, and it's claim number five, which discloses the hydrogen halide acid addition salts of bupropion, which every witness in the court below conceded in the pharmaceutical context discloses a genus of two, the hydrochloride salt form of bupropion and the hydrobromide salt form of bupropion. Do we have to agree with you that the MEDA patent actually does disclose that despite the trial court's finding to the contrary in order for you to prevail? No, Your Honor. You can also find, and we suggest that you should find, that it's nevertheless obvious in light of the other prior art that is cited and the fact that it is such a small genus, it would have been obvious to move from hydrochloride to the hydrobromide for all of the reasons disclosed in the court below, including the fact that hydrobromide is known to be a more stable salt form than hydrochloride in connection with drugs. Do you disagree with the appellee's statement in the record that it spent a certain number of years and certain millions of dollars in research in order to reach the result? No, Your Honor, for two reasons. One is they didn't file a full form new drug application in order to get it disapproved. They were piggybacking on the 40 years that preceded them in the form of the Welbutrin franchise, the Zyven franchise. They simply changed the salt form and were able to rely on all of that data or a lot of that data. It's not unlike what happens when you file for a generic, it's a short form, an abbreviated new drug application in connection with a different salt form. What about the stability results and the other differences they discuss? Do you disagree with those as a matter of fact? I'm sorry, I couldn't hear your question. The shelf life results, extension from 18 months to 36 months and so on? It's not clear from the record. Yes, we disagree with that as a factual matter. The Zyven and the Welbutrin and such, they didn't have more than 18 months, but they didn't try to get more than 18 months. There's no evidence in the record that they ever attempted to have a longer shelf life. It's not part of the claims, right? Pardon me? It's not part of the claims. Exactly my second point. There is no claim directed to a more stable salt form or enhanced stability or anything of that kind. But the claims do require once-a-day dosing, and by definition once-a-day dosing has to be more stable than Welbutrin because Welbutrin could not be dosed once a day, correct? No, Your Honor. And the field of invention in each of the patent specifications describes stability as the critical purpose of the invention. They do claim that this is an enhanced or more stable drug, but it has nothing to do with the dosing. The kind of stability they're talking about is shelf life. How long can we leave it on the shelf? And there's no evidence in the record that there was an attempt to have a longer shelf life claim for Welbutrin than 18 months. But in any event, it was never claimed. It's not a feature that was claimed. It's simply what they claim is their motivation for finding a new salt form. I understand with respect to a number of these claims your argument is based on the MEFA patent, and you've described it. But one problem I'm having is the 992 patent, Claim 1, where you're not asserting that MEFA anticipated that Formula 1 of the hydrobromide. Address that for us. You're claiming inherent anticipation. Yes, Your Honor. And yet, if I understand correctly, your expert who did the tests following the MEFA Example 1 departed from MEFA Example 1. In only one respect. The Example 1 in the MEFA patent discloses a final salt formation step that allows you to form the hydrochloride salt, which was what was the active ingredient in Welbutrin and Zyban. The only respect in which our expert diverted or left that procedure was he knew he wanted to make the hydrobromide salt to see what kind of polymorph it formed. And so the only respect in which he didn't follow the synthetic pathway was he didn't make the hydrochloride again. He made the hydrobromide. Because you told him to, not because it inherently arose from following the example, right? Exactly. We asked our expert to practice the full scope of the teachings of that patent. If we followed the legal argument that is being made by the appellee in this case is you have to slavishly follow and only practice the examples, the elements that are exemplified in the claim, the legal error we submit is we're entitled to look at the full breadth, the scope of the teachings of that patent. In other words, it teaches the use of mineral acid salts. It teaches the use of hydrogen halide acid addition salts in Claim 5. The argument being made by the appellee and followed by the court below was that we can't practice the full scope of that claim. We have to practice only the hydrochloride salt and then test that. And that doesn't make legal or scientific sense. The scope of the teachings of that patent are hydrogen halide salt forms. We did ask our expert to practice the full scope of the claim. And he conceded that the only way he got to the bromide was you told him to. He didn't just say I'm going to practice this and see what I come up with. You told him to substitute. And the trial court specifically found that that made your expert not credible on that point. So what other evidence do you have? Your Honor, the legal argument that it's not a factual argument. In other words, that expert was in fact asked to practice the claim of the patent by practicing the other pharmaceutically acceptable hydrogen halide acid addition salt, there being only two. We already had the hydrochloride. We asked him to do a separate one. We also asked him to follow in every other respect the teachings of that patent. And I do not recall the court below finding that there was a lack of credibility in his efforts to follow the other steps of the example number one of the patent. What he did was simply change the hydrochloride to a hydrobromide salt form, which is in fact practicing the other half of the scope of Claim 5 of that patent. As a legal matter, we submit that we have to be allowed, in order to practice the full scope of the claim, to divert from that at least insofar as we need to in order to come up with the other hydrogen halide acid addition salt. We submit that's a legal error, not a factual error, and the credibility didn't go into it. We did in fact ask him to practice the other aspect of the claim. And you're saying that's the only basis on which the district court found Dr. Watson, or I'm sorry, Dr. Buckton, right? No, Your Honor. The expert in the court below that did the synthesis was our Dr. Adlington. Dr. Buckton was a fully blinded pharmaceutical expert who we asked to look at the state of the prior art and to make a recommendation about how he would solve the purported civility problems that the plaintiff claims were existing in Walgreens. The district court found Dr. Buckton unreliable, discredited on several bases, yes? I think the district court disagreed with Dr. Buckton's conclusions, claiming that he didn't answer questions about why he followed particular teachings and not others. Frankly, the court below Dr. Buckton wasn't asked that question directly. What he did do, on the other hand, was on a fully blinded basis, he was given the prior art and asked to have a look at the prior art and the teachings and to report on how he would go about solving the purported civility problems with bupropion, with bupropion hydrochloride. And on a fully blinded basis, he said, I would look at all these prior art references, including the Burge reference and the Digley reference, I would change the salt form from hydrochloride to one of a list of seven that he came up with. And on that list was hydrobromine. And on that blinded basis, without knowing who he was working for, or even if this was a patent case, he concluded that he would move from hydrochloride to another salt form less likely to concentrate water and that that would solve the problem. Now, that fundamental holding, that fundamental opinion, the district court didn't take issue with, he did question his reading of the various references about, you know, this reference says you should use a smaller camphor ion, or this reference says you should move away from it. Here's the problem. He didn't just question. He made specific findings of fact with respect to what each reference disclosed, and those findings of fact we can only review for clear error, correct? Yes, Your Honor. So he said that that testimony was not credible because the prior art did not disclose what your expert said it did. He took issue with some of the things that the expert said he found in the prior art. That is correct. I mean, that's what happens when you have a finder of fact, right? Yes, it does. If taking issue means he found the contrary. Yes, he did, on a factual matter. But he made three fundamental legal errors in getting there that we suggest compelled reversal. The first is that he failed to follow the closest, most analogous precedent of this court, the Pfizer v. Aphitex case, and instead followed the Sanofi-Sintolevo case, which is not directed to salt selection, which is the technology here, but instead is directed to different salts of an entirely new drug. Well, when you say he failed to follow, he clearly distinguished Pfizer. He didn't ignore it. Well, the first thing he did was say that he didn't have to address Pfizer v. Aphitex because the examiner had that case in front of him and allowed the claims nonetheless. But he did. He said he didn't have to, but he did it. Did he not? He did, at that point, look to three elements that you're distinguishing, but I would suggest that this is a stronger case than Pfizer on several different levels that are outlined. There's a point in your brief where you simply quote him in the first part as saying, I don't have to do this because of the examiner, and you leave off the very next paragraph. He, in fact, goes ahead and does the analysis and distinguishes. He does address several of the points of distinction, but I suggest all of those are legal errors as well, and the first one being the fact that there were clear teachings in the prior art. My point is that it's an error of a lawyer to not go ahead and reveal that to me. That is to say, he went ahead and did this, but then you don't go ahead and discuss the fact that he, in fact, distinguishes the case. I'm sorry, Your Honor. It was our intention to point out that those distinguishing elements were not, in fact, legally accurate in the sense that we then proceed to describe the ways in which, no, in fact, this case is a stronger case than the one set forth in Pfizer v. Apotex, principally because this is an assault former that was not three or four years old, but rather was almost a century old, and it was the second or third most prevalent salt form in use during the relevant period, the hydrobromide salt, as opposed to the salt that was relatively new and virtually unused in the Pfizer v. Apotex case, and so in that respect, we submit the district court got that wrong. The second element in which we distinguish or we take issue with the way the judge distinguishes it is the fact that the commonality of the salt form, hydrobromide, was not only used as a salt former, it was also used as an active ingredient, which leads to the other problem, the bromide. And finally, it was the same expert that was rejected in the Pfizer v. Apotex, it was the expert that testified in this court below on behalf of the plaintiff, Dr. Anderson, who gave essentially the same testimony that was rejected by the Pfizer v. Apotex court, saying that there were infinite numbers of salts and it was impossible to limit it. Well, first of all, the Pfizer case, our court has repeatedly said, is limited to the very specific facts in that case, correct? Yes, the court does say that it is facts. And in that particular case, there were specific teachings in the prior art that this trial court found didn't exist, that similar teachings as it relates to these salt substitutions. I mean, Pfizer didn't say every time you're going to substitute one salt for another, then you can just assume it's always obvious. It didn't say that. No, not at all. So you have very specific fact findings in Pfizer that are just the opposite of the very specific fact findings we have here. I suggest it's not, that you needed, the trial court in Pfizer, in this court and in Pfizer v. Apotex, looked to those additional teachings because it was an essentially new salt form. It had only been used in two or three drugs, and so the court looked to those questions, but also accepted the concept that there are finite numbers of pharmaceutical salt formers out there, and there's no need to have predictability about the properties with that kind of precision. We submitted, that's what the trial court was looking to in this case, that we had to be able to predict, number one, stability, which is an acclaimed feature, and we had to predict that it would be enhanced by moving to the hydrobromide. In this case, using a hydrobromide salt, which is one of the most common salt forms in use in pharmaceuticals today, and was at the relevant time, we submitted as a stronger case than this relatively unused salt, the topsoil or bestialate salt that was used in the Pfizer v. Apotex. So why did it take 20 years to come up with it? I submit, Your Honor, no one was trying. I mean, until the patents were coming up for expiration, the patents that covered Wellbutrin and Zyban. But the judge cited some very specific failures, repeated failures, and that everyone was concerned about the lack of stability. There was no evidence in the court below. Again, the problem is you're acting like the record doesn't exist. No, not at all, Your Honor. The record in the court below did not have a record of anyone trying to find other salt forms to solve the stability problem, and so the plaintiff did. And they did, and the internal documents that were also a record made clear, they did so because the patents covering Wellbutrin and Zyban were coming for expiration. So for years, people are trying to figure out stability. It never occurs to them to substitute this salt, and then it takes the plaintiff four years once they start and target this concept to come up with it, and you're saying that it all would have been so easy for anyone to do? Your Honor, there is no evidence in the court below that until the plaintiffs took over what they refer to as the Wellbutrin franchise and started looking for a new salt form that anyone was trying to do this. I mean, the 18-month shelf stability, there was no evidence of record that that was a problem at any point until the patents came up for expiration. And as to your other point about how long it took them, the evidence of record below was clear that the plaintiffs here, Valiant, settled on a list of salt forms they tended to try within weeks, that they hired in consultants that were also in drug development that had more capacity for research and development, and they settled on a list within weeks. And on both of those lists, as on the list of our blinded Dr. Buckton, was the hydrobromide salt. Mr. Tony, I think we're out of time. Mr. Tony, I have one more for you. At the bottom of page six of your blue brief, this is what I was referring to earlier, instead of analyzing the Pfizer case and applying that precedent to Valiant's patent claims, the district court relied chiefly on the fact that the patent examiner was aware of the Pfizer case, and then you changed the subject. Now, I don't think that's true. When I turned to your reference at 823, I find that the next page, the district court flat out specifically distinguishes Pfizer. And I didn't like it, and I want you to know that. Are you following me? Yes, Your Honor. Thank you. We'll give you two minutes for rebuttal. Ms. Gillis? Good afternoon. May it please the court, I'm Teresa Gillis, representing plaintiff Apolli Valiant. Help me here. Let's put aside the claim one of the 992 patent, which is to this formula one, and let's talk about the other claims. And let me give you an example, claim one of the 610 patent, which is the independent claim for the claim three, which is the asserted dependent claim. A method of treating depression comprising administering an effective amount of bupropion, a hydrobromide, to keep depression the subject of need thereof. If that were a claim standing alone, would that be anticipated by MESA? Were you reading verbatim? Yes, I was reading verbatim from claim one of the 610 patent. I'm sorry, Your Honor, could you? I'm sure that you're... Thank you. It describes the compound being used to treat depression, and I'm asking you if that were the only claim we were dealing with, would that be anticipated by MESA? I don't believe it would be for two reasons. One is we disagree that bupropion hydrobromide is disclosed in MESA, and I also believe that the reference to stability is something that is not taught in MESA. How do you respond to the argument that stability is not actually in the claim itself? There is no requirement that an unexpected result be in the claim. No, we're talking about anticipation. Unexpected results have nothing to do with anticipation. I'm asking you a question of whether claim one is anticipated by MESA. And you say that the hydrobromide salt formulation is not disclosed by MESA. How can that be? Because hydrobromide, a member of a genus is patentable over and is not disclosing a reference if it has very different properties. That's not my understanding of the case law. My understanding of the case law is if it's a small number in the genus, it is disclosed. And here there are only two compounds which are part of the genus, the hydrobromide and the hydrochloride, if you use VERGE the way we did in Pfizer and limit it to pharmaceutically, FDA-approved pharmaceuticals, right? I actually believe, Your Honor, the case that we've cited on enantiomers is an example where you have only two. No, no, wait. This is going to get confusing. What I'm asking you is why doesn't MESA disclose hydrobromide? It is true that the only two members of the genus which are FDA-approved are hydrobromide and hydrochloride, correct, in MESA? That's correct? I believe that's correct. I don't know of any other salts. So how can it be that if there are only two members of the genus that it's not disclosed by MESA? Well, MESA actually isn't limited to pharmaceuticals, so MESA is disclosing all four. The claim is not limited to pharmaceutically accepted. Yeah, but in Pfizer we said that you can look to VERGE to limit it to FDA-approved products, right? I don't understand that it's a holding in Pfizer, but Pfizer was dealing with a completely different issue. The issue we're dealing with here is, is there a disclosure of a compound based on the genus? All right, how many members of the genus, in your view, are there in MESA? Four rather than two? I believe it's five in all. Five? There are five members. Okay, so what case holds that a genus of five doesn't disclose each individual one for purposes of anticipation? I believe all of your case law and anticipation holds that. You have to look at, I believe the case law. No, not case law in general. What case says that a genus that's that small doesn't disclose each? The Sanofi case that we've cited with the enantiomers, because there are only two in that case? Okay, let me ask you to assume that we disagree with you and that either the two or the four disclosure of the genus does anticipate the hydrobromide. Then how can it be that a controlled release formulation or a once-a-day formulation is not obvious in the light of that disclosure? Because there would have been no reason. We are into a novel composition here. That the parties agree on. We do not have an old composition. Having the appropriate hydrobromide in a once-a-day or an extended release formulation is new. So we're dealing with a novel composition. When you go into that, under KSR, under Pfizer, under Sanofi, you have a two-pronged test to determine whether those old elements. This court doesn't have to decide, in our view. But nobody's disputing that using a once-a-day or a controlled release tablet is something that was well known in the art. If you have the compound being disclosed in the prior art to treat depression, why would it not be obvious to have a once-a-day dosage or alternatively to have a controlled release? Because why would somebody pick the appropriate bromide out of all the prior art salts that are disclosed? And there are many disclosed for bupropion. You need some teaching, some motivation to make that combination. And then you have the second part. But if the prior art told you to use hydrobromide to treat depression, why wouldn't it be obvious, since everybody in the business had controlled release tablets or once-a-day tablets, to make that combination? Why wouldn't you use any of the other salts? What directs you? What does it motivate you to pick this salt to put in this combination? Because the hypothetical is that method teaches you to use hydrobromide to treat depression. Assume that that's true. I know you want to dispute that. But assume that there is a disclosure in method to use the hydrobromide salt to treat depression. Why isn't it obvious to have a controlled release formulation? Because there would have been no reason to pick it over all of the other salts disclosed of bupropion and because of the unexpected results. Because as the Supreme Court says in KSR, putting old things together may look obvious with hindsight, but if you have unexpected results, it's passable. And here we have undisputed, unexpected results. Well, I don't understand what's unexpected. I mean, it's taught to use it to treat depression. It's unexpected to put it in a controlled release formulation? Does it work with that? That is correct, because no one would have expected that you could address the stability problem. And as this Court's Apotex decision, the advisory Apotex, makes clear, the expectation of success is directed to what were you trying to achieve? And here we were trying to achieve a more stable controlled release formulation. Just so we're clear, the anticipation ruling on Claim 1 of the 610 is not at issue on appeal, right? That is correct. Claim 1 was not at issue below. So, I mean, to the extent that the judge ruled as to literal anticipation with respect to anything on the 610, they didn't appeal that? That's correct. Okay. So it's only an obviousness argument. That's correct. And all of the claims that are at issue have within them this controlled release or sustained release or winter day aspect. And so what you have is a novel composition, which gave rise to unexpected results in solving what had been a long problem, which actually was called out in 1984 by Billinghurst. This has been known for 20 years before this invention. And as I recall, the trial judge made specific findings that there were teaching away from the use of hydrobromides that would have led someone, if they were going to try to solve substitute to a different salt, not that one. That is correct. And that's actually part of the reason the judge discredited Buckton because Dr. Buckton simply ignored all of those negative teachings. When it showed in a chart, an old chart, that bromide was sometimes chosen for various purposes, Buckton relied on that old chart and ignored the fact that by 2004, bromide was no longer the drug, even within the realm of possibility. So that had been removed actually from that chart. Correct. Because people didn't think it was going to work. And that was the finding the trial court made, right? The trial court made the finding that the teachings and all of the references that were cited would have led you away from the bromide, not toward it, to solve the problem that was at issue. So even though the prior art disclosed using this very compound to treat depression, you say that somebody going back and finding that and exploiting it means that it's unexpected results? I believe that yes. Old things that sit out there in the prior art, if I accept your hypothesis that it's old, putting them together and getting something unexpected when it's a new composition. There isn't, I mean as a single standard, why would you be motivated to try this to solve that? You need to find a motivation. KSR makes that clear. Why isn't there motivation to use it if it's known to treat depression? But why not use anything else? You need to be being focused in on it. That sounds as though what you're saying is that if you discover something that was disclosed, a compound that was disclosed to treat depression in the prior art, and you go and find that and say, okay, now I've discovered that it can be used to treat depression and that's my discovery, is that something that was described as treating depression really does so. If that's all we had claimed, we might be arguing a different case. What is claimed here is a solution to the problem that existed with the shelf life of the extended release formulation. It wasn't just shelf life, was it? Weren't there other beneficial aspects? Oh, there were many beneficial. Basically that was what drove the project. What came out of it, though, were many more unexpected. And they were unexpected. Exactly. And the court made factual findings as to those which are not clear errors. So we have an accepting that it's old components, it's a novel composition, that even if you accept there's a motivation to go to it, the second problem that's required under KSR and under this court's precedent in Pfizer, in Sanofi, is that there be a reasonable apprehension that it's going to succeed to satisfy that motivation. And there is nothing in the record that suggests, in the court's fact findings, that one would have expected or would have looked to the bromide to solve that problem. You wouldn't expect that it, for example, resisted alcohol. Excuse me? That it resisted alcohol use. There's no teaching at all of that in the program. There's no teaching on the reduced seizures. None of these features that you're describing was actually claimed here, right? You're not required to claim the advantages. It's correct that they weren't claimed, right? In the claims that are at issue, that's correct. We don't reference stability. But there's no requirement. In KSR, the Supreme Court didn't say you had to talk about the advantages. What you claim is the thing that has the advantages. And if it has the advantages, it's patentable. There's no requirement that it be recited in the claims. Similarly, if you look at the amlodipine claims in the Pfizer case, they were claiming that it was better for manufacturability. That wasn't in the claim. Your null decision expressly says you don't even have to have the advantages in the application, never mind in the claim. The fact is we have claimed a composition which has this attribute, and that's uncontroverted on this record. Which was inherent in the prior art compound. Actually, that is also not correct with all due respect. What Billinghurst pointed out is there was an interaction between the excipient and the bromide. It wasn't the – Billinghurst explained there were two problems. Which excipient? Because there's no specific excipient in these claims. Apparently, the reactivity of the bromide with excipients is less than that of the hydrochloric. Any excipient. That is what the record shows. If that weren't the case, defendants could have come forward and said your claim is too broad, you've got a 112 problem. But the fact is we unexpectedly found that the bromide, for whatever reason, and we did testing to establish that in the formulation we didn't experience these degradation problems, products which you do get with the chloride. More? I think, Your Honor, that if you don't have more questions. Okay, thank you. Mr. Chikami, you have two minutes. Thank you, Your Honor. What's your response to the point that it's not the hydrobromide that creates the stability but the combination of the excipient? I don't recall that being in the record, the corporeal. I don't recall there being evidence as to what was the source of the enhanced stability of the other unexpected results. Certainly none of the claim features. And this court has, I mean, there is no, and as a result there was no nexus established between whatever it is in the claims and these purported unexpected results. But again, that's a factual question, and the trial court specifically found the nexus was established and that it flowed inherently from that. The point, my second point being that we don't get there, that this is a stronger prima facie case of obviousness. Well, you do get there because the case law is very clear that it's not a question of prima facie versus, you have to consider everything, including objective indicia. I mean, we have case after case after case that says all of it comes in, the decision gets made after everything is considered. So let's consider it all. Yes, Your Honor. And further, besides the fact that this is the stronger case, the evidence of the fact that it happens to be more stable, we suggest, doesn't overcome the prima facie case of obviousness, given the fact that this is the second or third. All right, it doesn't have to overcome anything, okay? Let's talk about the objective indicia. It's part of the initial analysis. I mean, again, case after case after case that come out of our court that says this. So if it's part of the analysis, then you can't just ignore it. So the judge made very specific findings of fact that there are unexpected results. We have case law that says that's probably one of the most important objective indicia. The court also found long-term failure of others, and the court found a nexus to the unexpected results. So we have to weigh that into the analysis. Yes, Your Honor. You keep just trying to ignore it. Respectfully, I'm not trying to ignore it. That was actually the subject of testimony in an argument that I gave just a few minutes ago that there was nothing unexpected, at least on behalf of Dr. Buckton, if you move from hydrochloride salt, which is known to concentrate water and result in instability, to another salt. And he gave many references that taught moving to another counter ion like that of the hydrobromide, it was expected to at least change stability, probably enhance it, because it's not going to concentrate water. But what about all of the other benefits that flow? The other benefits, such as there are, do not have nexus to these claimed inventions. I mean, for example, the fact that there's a difference in seizures, that's not unexpected. Bromine was the first approved drug for treatment of seizure disorder. So suggesting that if you move to a hydrobromide salt form, that it's unexpected that results in lower seizure. Of course, it's not. Bromine has been used for over 100 years for treatment of seizure disorder. Okay. Thank you, Mr. Townsend. Thank you very much. Thanks, Dr. Townsend.